THIRD DIVISION
September 30, 2008

No. 1-07-2047

| | | |
|---|---|---|
| WASIM SAM AHMED, as Administrator of the Estate of Gul Nageen Ahmed, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 02 L 008938 |
| PICKWICK PLACE OWNERS' ASSOCIATION and VISTA PROPERTY MANAGEMENT, INC., | ) ) ) | Honorable |
| Defendants-Appellees. | ) ) | Sharon Johnson Coleman, Judge Presiding. |

_____JUSTICE THEIS delivered the opinion of the court:

Plaintiff, Wasim Sam Ahmed, as administrator of the estate of Gul Nageen Ahmed, filed a two-count wrongful death and survival action against defendants, Pickwick Place Owners' Association and Vista Property Management, Inc., to recover for his daughter's drowning death in a retention pond owned and managed by defendants. After a trial, the jury returned a general verdict for plaintiff in the amount of $100,000, but answered "No" to a special interrogatory on proximate cause. The trial court ultimately found that the verdict was irreconcilable with the special interrogatory and entered a judgment notwithstanding the verdict in favor of defendants.

On appeal, plaintiff contends that (1) the trial court abused its discretion in denying his

1-07-2047

motions for leave to amend the complaint; (2) the trial court erred in granting the judgment notwithstanding the verdict and finding the special interrogatory to be inconsistent with the general verdict; (3) the trial court abused its discretion in failing to admit certain witness testimony; (4) the trial court erred in directing a verdict on various issues of fact; and (5) various other trial court rulings severely prejudiced and limited plaintiff's case. For the following reasons, we affirm the judgment of the circuit court.

BACKGROUND

On July 12, 2001, seven-year-old Gul Ahmed was riding her bicycle on a sidewalk located behind the apartment buildings at the Pickwick Place Apartments in Schaumburg, Illinois. As Gul attempted to turn her bicycle on a sidewalk circling a retention pond, she lost control of her bicycle and fell down a grassy embankment into the pond where she ultimately drowned.

Plaintiff filed suit against the property owners' association and the property manager of Pickwick Place. The original complaint was filed on July 16, 2002. Therein, plaintiff alleged that defendants negligently maintained the retention pond and that Gul drowned after becoming entangled with a bicycle or other debris in the pond. Additionally, plaintiff alleged that defendants were negligent in failing to maintain a sidewalk of proper width in accordance with certain Village of Schaumburg code provisions and allowed a dangerous slope to exist from the sidewalk to the retention pond. The latter two theories were ultimately abandoned prior to trial.

Gul's mother and sister were the only two eyewitnesses to see Gul fall into the retention pond. Gul's mother, Shaista Ahmed, testified at trial that on July 12, 2001, she was walking with

her five-year-old daughter, Arisha, on the sidewalk, while Gul was riding her bike. They were traveling on the sidewalk that ran between two buildings and connected in an intersection with the main sidewalk surrounding the retention pond. At the intersection, Gul attempted to turn her bicycle. Her front wheel touched some dirt and she slipped off the sidewalk and went down the hill on her bike and fell into the pond. Gul's sister, Arisha, testified that she saw her sister was about to make a turn, she hit some dirt, and fell down the hill really fast and into the pond. Neither Mrs. Ahmed nor Gul knew how to swim.

Mrs. Ahmed began screaming for help at the nearby swimming pool. Suzanne Daniel, a tenant who lived on the second-floor of the nearby apartment, testified that she heard screaming. She noticed a child bobbing up and down, struggling in the water. She called the police and told them there was a child that appeared to be stuck on something. Daniel did not see Gul attached to anything, but believed she was stuck by the way she was struggling in the water. Daniel did not know that Gul was unable to swim.

Several individuals testified regarding the rescue efforts to save Gul and their observations regarding the condition of the pond. James Wasser, a lifeguard at the Pickwick Place swimming pool, testified that once alerted that there was a girl in the pond, he dove in with three other individuals. He could not see below the surface of the pond and was unable to locate her. A short time later, the police and fire departments arrived and eventually located Gul and pulled her out of the water. She was found several feet from the shore in approximately four to five feet of water.

Wasser testified that as Gul was being pulled out of the water, a bike came up from the

surface of the water, and then, it dropped back into the water as a firefighter brought her to shore. Wasser indicated that plaintiff's exhibit No. 4 was an accurate photograph of the bike that was sticking out of the water after Gul was pulled out. The police later pulled that bike out of the water. Wasser only saw that bike and Gul's bike at the pond that day. Karen Jernstad, a tenant at Pickwick, testified in an evidence deposition that she witnessed a firefighter pull Gul out of the pond. She saw a bike attached to Gul's t-shirt as she was pulled from the water. She identified exhibit No. 4, shown to her at her evidence deposition, as the old bicycle in the pond that was attached to Gul. Angela Nelson, a lifeguard at the Pickwick pool, testified that she saw a firefighter pull Gull out of the water. Nelson was about 10 feet away from the firefighter. She did not see any bicycle in the water, but she heard the firefighter say that the girl's foot was caught in the pedal.

Village of Schaumburg fire department lieutenant and paramedic, John Brohan, testified that he was the individual that found Gul in the pond. When he pulled her out of the water, there was a bike in the water within a few feet of Gul. He described the bike as being older and dirtier than Gul's bike. Brohan did not feel any contact between Gul and the older bike, and he did not see her entangled, entrapped or in any way connected to that bike. He did not recall telling anyone that Gul was attached to the bicycle. Village of Schaumburg police officer David Antes testified that he was on shore at the time Brohan pulled Gul out of the pond. Antes did not observe anything that would have indicated that Gul was in any way attached to the old bicycle.

Village of Schaumburg police officer Todd Bochenek testified that he was dispatched to the scene and saw Brohan carrying Gul out of the water. He saw a bicycle tire afloat in the water.

He never saw Gul in any way attached to a bicycle, but he could not see below the water surface and acknowledged that his attention was diverted while talking to Gul's mother. Village of Schaumburg firefighter and paramedic Donald Paul McCown testified that he was responsible for ensuring Brohan's safety and was focused on him from the time he entered the water until the time he recovered Gul. There was nothing that he observed to indicate that Gul was trapped or tangled on any debris. When Brohan lifted her out of the water, she was not attached to a bicycle. However, McCown could not see under the water and there was no way he could know if she was tangled with anything under the water.

Robert Friedewald, one of the individuals that dove in to the pond to attempt to rescue Gul, testified that he was in the pond right behind the paramedic when he found Gul. He did not see Gul attached, entangled, or trapped on any bicycle when she was pulled out of the water. He did see two bicycles on the day of the incident. One of them was Gul's pink bike and the other was a "rusted" bicycle in the area where Gul was found. He saw the rusted bicycle in the water before the day of the accident in the same spot where Gul was found. Although he could not be sure that the rusted bicycle he had seen previously was the same bicycle he saw the day of the accident, he described the photograph he was shown at his evidence deposition as the "old rusted up bike" that was found in the pond where Gul was found. When asked if he heard the paramedic who removed Gul from the pond say anything, he responded "no." However, when then asked if the paramedic stated that she was caught on a bicycle, he responded, "yes."

Several witnesses, including tenants and landlords at Pickwick, testified that they would often see bicycles and other debris in the pond prior to the accident. Ann Marie Rush testified

that she would take walks around the pond and see debris, bicycles, shopping carts, and auto parts in the pond. She spoke to her landlord several times about the debris and the safety of the pond, including putting up a fence. Christy Boyle saw a bicycle in the pond a few months before the accident, but only saw the handlebar sticking out of the water and could not identify if it was the same bike as in plaintiff's exhibit No. 4. She also notified her landlord, a board member of the Pickwick Place Owners' Association. Boyle never saw that bicycle in the pond after that day.

Several Pickwick board members testified that the board was responsible for hiring and overseeing the property management company. Its duties included responsibility for routine weekly inspections of the premises, including the pond and sidewalks. If objects in the pond were visible, they were to be reported to the ownership or management for removal for safety and aesthetic reasons. None of the board members who testified at trial indicated that they had received any complaints about bicycles or shopping carts in the pond or about the need for a fence. However, Mark Corrado indicated that he had seen shopping carts in the pond prior to the accident.

Mark Ranieri, president and employee of Vista, was hired by Pickwick six months prior to Gul's accident. He testified that pursuant to his management agreement, he had a responsibility to clean and maintain the common areas, including the pond and sidewalks. His responsibilities included overseeing lawn mowing, snow plowing, removing any items in the pond that were visible or that he was made aware of, and making sure that dirt or mud did not create a hazardous condition on the sidewalk. Warning signs were posted indicating no fishing, skating or swimming in the pond.

At the close of plaintiff's evidence, defendants moved for a directed verdict. The trial court granted it as to the issues of (1) the condition of the sidewalk; (2) lack of fencing; (3) lack of a life preserver; and (4) lack of warnings. The court, finding an evidentiary dispute as to whether Gul was attached to the rusted bicycle, determined that the jury would be instructed on whether defendants were negligent in failing to remove debris or bicycles from the pond after they knew or should have known of their presence and whether defendants' negligence was the proximate cause of Gul's death.

During the instruction conference, defendants tendered a special interrogatory on proximate cause as to whether Gul was trapped or tangled on the discarded bicycle, preventing her from exiting the water. Plaintiff objected to the instruction because it did not include all of the ways in which the bicycle could have harmed Gul. Defendants presented an alternate interrogatory asking whether Gul was trapped, tangled or attached in any manner on the rusted bicycle which prevented her from exiting the water. Plaintiff again objected because the new interrogatory was not sufficiently descriptive. Plaintiff then proposed the following special interrogatory: "Did the bicycle proximately cause her death?" The court then amended the special interrogatory as follows: "Did the rusted bicycle proximately cause Gul Ahmed's death?" There was no objection to this version of the special interrogatory from either party.

During closing argument, plaintiff focused on his theory of the case that the rusted bicycle in the pond caused Gul's death: "I don't care what else was in the pond. One thing that I do know that was in the pond on that day right in the spot where they found her is the bicycle that caused her death." Defendants' theory was that Gul drowned in the pond because she could not

swim.

During deliberations, the jury inquired if it could answer "no" to the special interrogatory yet still find for plaintiff. The court responded to the question without objection from the parties that the jury should answer the general verdict first and then resolve the special interrogatory. The jury returned a general verdict for plaintiff on the survival count in the amount of $50,000 and on the wrongful death count in the amount of $50,000, but answered the special interrogatory in the negative. The trial court found the general verdict to be irreconcilable with the answer to the special interrogatory, entered judgment notwithstanding the verdict in favor of defendants, and denied plaintiff's posttrial motion.

ANALYSIS

Plaintiff contends that the trial court erred in denying his numerous motions for leave to amend the complaint. On the day before trial, plaintiff sought to add a new allegation of negligence against defendants for failing to remove a "dirt spot" on the sidewalk that allegedly caused Gul to lose control of her bicycle. Specifically, plaintiff sought to allege that defendants were negligent in that they:

> "[a]llowed the sidewalk to remain in a defective, dangerous and
>
> hazardous condition in that it was slippery and had loose dirt,
>
> gravel, rock and other debris, after it knew or should have known
>
> of the dangerous propensity of the condition on the
>
> sidewalk/bicycle path."

Plaintiff focuses his argument on appeal on the relation-back doctrine as set forth in section 2-

616(b) of the Code of Civil Procedure (735 ILCS 5/2-616(b) (West 2006)), which allows for a complaint to be amended after the expiration of the limitations period so long as the original complaint was timely filed and the cause of action asserted in the amended pleading grew out of the same transaction or occurrence set up in the original pleading. Plaintiff maintains that the new allegation regarding the "dirt spot" on the sidewalk merely clarified the original complaint and, therefore, satisfied the relation-back doctrine.

Nevertheless, contrary to plaintiff's contention, defendants' argument and the trial court's ruling was not based upon the statute of limitations, the relation-back doctrine, or an interpretation of that statute. Rather, defendants' argument, and the trial court's ruling, was premised on a finding, as a matter of law, that the dirt on the sidewalk was not a hazardous condition for which defendants owed plaintiff a duty. Additionally, the trial court premised its ruling on the factors enunciated in the seminal case of Loyola Academy v. S & S Roof Maintenance, Inc., 146 Ill. 2d 263, 273, 586 N.E.2d 1211, 1215-16 (1992). Inexplicably, plaintiff fails to address the Loyola case or make any argument in relation to the factors delineated therein. Nevertheless, even considering these factors, we find no merit to plaintiff's contentions regarding the trial court's ultimate ruling.

Section 2-616(a) of the Code provides that at any time before final judgment, the court may permit amendments on just and reasonable terms to enable the plaintiff to sustain the claim brought in the suit. 735 ILCS 5/2-616(a) (West 2006). In considering whether a circuit court abused its discretion in ruling on a motion for leave to file an amended complaint, the reviewing court considers the following factors: "(1) whether the proposed [amended complaint] would

cure the defective pleading; (2) whether other parties would sustain prejudice or surprise by virtue of the proposed amendment; (3) whether the proposed amendment is timely; and (4) whether previous opportunities to amend the pleadings could be identified." Loyola Academy, 146 Ill. 2d at 273, 586 N.E.2d at 1215-16. Given the broad discretion a trial court exercises in ruling on motions to amend pleadings prior to final judgment, a court will not reverse the denial of a motion for leave to amend unless there has been a manifest abuse of discretion. Loyola Academy, 146 Ill. 2d at 273-74, 586 N.E.2d at 1216.

With respect to the first factor, a court "may consider the ultimate efficacy of a claim as stated in [the] proposed amended pleading." Hayes Mechanical, Inc. v. First Industrial, L.P., 351 Ill. App. 3d 1, 7, 812 N.E.2d 419, 425 (2004). To recover damages based upon a defendant's alleged negligence, a plaintiff must allege and prove that the defendant owed a duty to the plaintiff, that defendant breached that duty, and that the breach was the proximate cause of the plaintiff's injuries. Marshall v. Burger King Corp., 222 Ill. 2d 422, 430, 856 N.E.2d 1048, 1053 (2006). Whether the law will impose a duty upon a defendant for the benefit of a plaintiff depends on the nature of the relationship. Marshall, 222 Ill. 2d at 436, 856 N.E.2d at 1057. Whether or not a duty of care exists is a question of law. Forsythe v. Clark USA, Inc., 224 Ill. 2d 274, 280, 864 N.E.2d 227, 232 (2007).

Here, the parties do not dispute that the Association owned and hired Vista to maintain the sidewalk in question as a common area for the use of the residents of the apartment complexes. Based upon that relationship, defendants had a duty to exercise reasonable care to keep the premises over which they maintained control for the common use of the residents in a

reasonably safe condition. See Smolek v. K.W. Landscaping, 266 Ill. App. 3d 226, 228, 639 N.E.2d 974, 977 (1994) (townhouse association had duty to maintain common areas in a reasonably safe condition). Accordingly, the question for our consideration is whether defendants' duty to maintain the sidewalk in a reasonably safe condition encompasses a duty to remove dirt or mud from the sidewalk.

A spot of dirt on a sidewalk is not inherently dangerous or hazardous either in substance or location. See Novak v. C. M. S. Builders & Developers, 83 Ill. App. 3d 761, 766, 404 N.E.2d 918, 922 (1980), citing Landman v. M. Susan & Associates, Inc., 63 Ill. App. 2d 292, 211 N.E.2d 407, 410 (1965) (pile of sand possesses no inherent hazard or danger in substance or location). Nor is there evidence presented in the record that the dirt spot or "mud patch" on the sidewalk was anything other than a natural accumulation of dirt that formed as a result of the sidewalk's close proximity to a grassy area and natural soil erosion. The photographs presented by plaintiff in plaintiff's exhibit No. 2, depicting the sidewalk at the location of the incident, reveal a pristine sidewalk with a small patch of dirt in one spot abutting a grassy area. There is no evidence that defendants created a hazard there or that the dirt was "piled up" unnaturally by defendants.

Although not directly controlling, courts considering a landowner's duty in relation to natural conditions on property have found premises liability law regarding the duty to remove naturally accumulating ice or snow to be instructive. See Pageloff v. Gaumer, 365 Ill. App. 3d 481, 484, 849 N.E.2d 1086, 1089 (2006) (in finding campground owner owed no duty to clear fallen walnuts from campsite, court applied natural accumulation rule); Bonavia v. Rockford Flotilla 6-1, Inc., 348 Ill. App. 3d 286, 295, 808 N.E.2d 1131, 1138-1139 (2004) (natural

accumulation rule applied to show no duty with respect to slippery algae that grew on a boat launch ramp); Burns v. Addison Golf Club, Inc., 161 Ill. App. 3d 127, 130-31, 514 N.E.2d 68, 71 (1987) (appellate court relied upon natural accumulation rule where the plaintiff tripped on an exposed tree root, a natural condition on the defendant's golf course).

Illinois courts have consistently found that a landowner does not have a duty to keep his premises safeguarded against the potential danger of naturally accumulated snow and ice. Ordman v. Dacon Management Corp., 261 Ill. App. 3d 275, 279, 633 N.E.2d 1307, 1310 (1994), citing Graham v. City of Chicago, 346 Ill. 638, 641, 178 N.E.2d 911, 912 (1931). Similarly, it would be equally onerous to require a landowner to remove all of the naturally accumulated dirt from every sidewalk on his property and, therefore, equally unreasonable to impose such a duty here without a showing that defendants created or were aware of a hazardous condition.

The record does not support plaintiff's allegation that the sidewalk was in a dangerous or hazardous condition as alleged. Merely because the property manager indicated in an offer of proof that he felt a responsibility to clean the dirt does not create a legal duty on his part. Indeed, when asked whether he thought it was a hazard, Mr. Ranieri testified in the offer of proof that it "[d]oesn't look like a hazard, no." In light of the foregoing, as a matter of law, defendants were not liable to plaintiff in failing to remove the natural accumulation of dirt from the sidewalk. Consequently, pursuant to Loyola, where no cause of action could be stated based on this theory, the trial court did not abuse its discretion in denying plaintiff leave to amend his complaint. Loyola Academy, 146 Ill. 2d at 276, 586 N.E.2d at 1216 (a plaintiff must meet all four factors to establish an abuse of discretion).

Nevertheless, we briefly consider the other <u>Loyola</u> factors. We note that plaintiff sought to amend his complaint to pursue a claim based on the dirt on the sidewalk on the day before trial, several years after the inception of the lawsuit. The record supports defendants' contention that they had no notice until the eve of trial that plaintiff would pursue this claim and, therefore, were prejudiced by their lack of opportunity to prepare a defense to this claim. Whether defendants had actual notice of the dirt on the sidewalk is distinct from whether they had notice until the eve of trial that plaintiff would pursue a claim based on the dirt. See <u>Hartzog v. Martinez</u>, 372 Ill. App. 3d 515, 525 865 N.E.2d 492, 500 (2007) (prejudice shown where defendants may have been told of inadequate lighting in the stairway, but there was no indication that they would be required to defend against such a claim.)

Notably, during Mrs. Ahmed's deposition, she was asked whether she knew what caused Gul's tire to go off the sidewalk. In response, she stated, "No, I don't remember what happened." Additionally, when asked where there was anything about the sidewalk that caused the wheel of the bicycle to come off the sidewalk, she responded as follows: "No, I don't remember any such thing." She also indicated that she did not notice a hole or a crack or any debris on the sidewalk. She mentioned the narrow width of the sidewalk. When asked whether her daughter, Arisha, remembered the accident, Mrs. Ahmed indicated that she did not think she remembered anything about the day of the accident.

Additionally, plaintiff provides no explanation as to why he could not have made these allegations at the inception of the lawsuit where the only two eyewitnesses, Gul's mother and sister, presumably were aware of the facts surrounding Gul's fall since the day of the incident.

- 13 -

Furthermore, plaintiff had several previous opportunities to amend the complaint and indeed had already amended the complaint two times. Accordingly, pursuant to Loyola, the trial court was well within its discretion in denying plaintiff's numerous requests for leave to amend the complaint.

We next consider plaintiff's argument that a judgment should have been entered on the general verdict in favor of plaintiff because (1) it was not inconsistent with the special interrogatory; and (2) the special interrogatory was ambiguous, confusing, and not in proper form.

The use of special interrogatories is governed by section 2-1108 of the Code of Civil Procedure, which provides in pertinent part as follows:

> "The jury may be required by the court, and must be required on request of any party, to find specially upon any material question or questions of fact submitted to the jury in writing. Special interrogatories shall be tendered, objected to, ruled upon and submitted to the jury as in the case of instructions. Submitting or refusing to submit a question of fact to the jury may be reviewed on appeal, as a ruling on a question of law. When the special finding of fact is inconsistent with the general verdict, the former controls the latter and the court may enter judgment accordingly."
>
> 735 ILCS 5/2-1108 (West 2006).

The special interrogatory guards the integrity of a general verdict by testing that verdict against

the jury's determination as to one or more specific issues of ultimate fact. Simmons v. Garces, 198 Ill. 2d 541, 555, 763 N.E.2d 720, 730 (2002); Snyder v. Curran Township, 281 Ill. App. 3d 56, 63, 666 N.E.2d 818, 824 (1996) (purpose is to "sharpen the jury's consideration of the questions presented by the case, to ascertain the jury's finding on an ultimate issue of material fact, and to serve as a check upon the jury's deliberations by testing the jury's general verdict against its determination on the material fact at issue.")

 In determining whether an inconsistency exists, all reasonable presumptions must be exercised in favor of the general verdict. Simmons, 198 Ill. 2d at 556, 763 N.E.2d at 730. An inconsistency exists where the special finding and the general verdict are " 'clearly and absolutely irreconcilable." ' Simmons, 198 Ill. 2d at 556, 763 N.E.2d at 730, quoting Powell v. State Farm Fire & Casualty Co., 243 Ill. App. 3d 577, 581, 612 N.E.2d 85, 88 (1993). They are absolutely irreconcilable if no " 'reasonable hypothesis' " exists that would allow the special finding to be construed consistently with the general verdict. Simmons, 198 Ill. 2d at 556, 763 N.E.2d at 730.

Where the court finds the answer to the special interrogatory absolutely irreconcilable with the verdict, and if the answer to the special finding is not against the manifest weight of the evidence, the special finding controls, and a judgment may be entered based on the special finding rather than on the general verdict. 735 ILCS 5/2-1108 (West 2006); State Farm Fire & Casualty Co. v. Miller Electric Co., 204 Ill. App. 3d 52, 60, 562 N.E.2d 589, 594 (1990). Our supreme court has explained that the reason underlying this rule is based upon a recognition that "a jury more clearly understands a particularized special interrogatory than a [general verdict,

- 15 -

1-07-2047

which is] a composite of all the questions in a case." Borries v. Z. Frank, Inc., 37 Ill. 2d 263, 266, 226 N.E.2d 16, 19 (1967). We review the trial court's finding of inconsistency *de novo*. See Simmons, 198 Ill. 2d at 556, 763 N.E.2d at 730; DiMarco v. City of Chicago, 278 Ill. App. 3d 318, 325, 662 N.E.2d 525, 530 (1996) (applying a *de novo* standard of review).

In the instant case, we conclude that the jury's special finding was "absolutely irreconcilable" with the general verdict. The jury answered "No" to the following special interrogatory: "Did the rusted bicycle proximately cause Gul Ahmed's death?" Proximate cause was defined in the issues instruction as follows:

> "[A]ny cause which, in natural or probable sequence, produced the injury complained of. It need not be the only cause, nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes the injury."

See Illinois Pattern Jury Instructions, Civil, No.15.01 (2006) (hereinafter IPI Civil (2006)). Plaintiff's theory at trial was that defendants' negligence in failing to remove the rusted bicycle from the pond caused Gul's drowning death by allowing her to become connected in some way to the bicycle and unable to free herself. If, as the jury found, the rusted bicycle did not cause or contribute to cause her death, then the necessary link between defendants' alleged negligence and Gul's injuries was missing and there could be no liability.

Plaintiff maintains that this was not the only theory of causation presented to the jury and that there were other reasonable hypotheses from which the jury could have found proximate

cause. Plaintiff essentially argues, albeit articulated in various ways, that the jury's verdict could have been based on defendants' failure to remove one of the other bicycles testified to, rather than the rusted bicycle depicted in plaintiff's exhibit No. 4, or that there were two different rusted bicycles. However, there was no evidence that any other bicycle contributed to or caused her death on July 12, 2001. Moreover, that was not the theory plaintiff presented to the jury.

Plaintiff's witnesses Wasser, Jernstad and Friedenwald were the key witnesses to in any way link a bicycle in the pond with Gul's drowning on the day of the occurrence. Wasser specifically identified the bicycle that came up from the surface of the water with Gul as the one shown in plaintiff's exhibit No. 4, the rusted bicycle. Jernstad identified that same bicycle as "the old bicycle" in the pond that was attached to Gul. Friedenwald did not see Gul attached in any way to a bicycle when she was pulled out of the water, and the only bicycles that he did see that day were Gul's pink bicycle and the "rusted" bicycle in the area where Gul was found. That other witnesses testified that they had seen a bicycle in the pond on a previous occasion and could not equate that bicycle with the rusted bicycle in plaintiff's exhibit No. 4 is of no consequence. Nobody testified that any other bicycle in any way caused or contributed to cause Gul's drowning on the day of the incident. Accordingly, plaintiff's arguments do not equate with a "reasonable hypothesis" from which the jury could have found proximate cause. See Simmons, 198 Ill. 2d at 561, 763 N.E.2d at 733 (where the only evidence of proximate cause was dehydration and the jury found dehydration was not the cause of death, the verdict was absolutely irreconcilable with jury's special finding).

Indeed, contrary to plaintiff's argument, plaintiff's theory at trial focused on a specific

bicycle. During the instruction conference on the special interrogatory, plaintiff's counsel stated, "I think what the issue in this case is is [*sic*] whether the bicycle proximately caused the injury." Plaintiff's counsel never argued that the special interrogatory was too limiting in that there were other bicycles that could have proximately caused her death. In his closing argument, he referred to one specific bicycle in referencing the evidence. He argued that defendants had notice that "this specific bicycle was there for six months to a year by Robert Friedewald," who was the witness that testified about the "rusty bicycle," and argued that "it was there on the day of the accident. The police pulled it out of the pond." Plaintiff's counsel explained, "[t]hat bike not only has algae, it's rusted to no end." "There's not one witness that will tell you that the girl and the bike were not in the same spot."

Based on the evidence presented, the only bicycle that plaintiff could be referring to was the rusted bicycle in the pond where they found Gul, which was the same bicycle that was pulled out of the water by police. It is well settled that the theory under which a case is tried in the trial court cannot be changed on review. Daniels v. Anderson, 162 Ill. 2d 47, 58, 642 N.E.2d 128, 133 (1994). To allow a party to change his or her trial theory on review would weaken the adversarial process and the system of appellate jurisdiction, and could also prejudice the opposing party, who did not have an opportunity to respond to that theory in the trial court. Daniels, 162 Ill. 2d at 59, 642 N.E.2d at 133-34. Accordingly, plaintiff's new hypotheses are inconsistent with the evidence of proximate cause and his theory at trial.

Plaintiff additionally argues that the special interrogatory was consistent with the general verdict because the jury might have believed that the "debris" in the pond and not a "rusted

bicycle" was the proximate cause of Gul's death. Plaintiff directs our attention to the issues instruction, which described defendants' negligence as their failure "to remove the debris and bicycles present in the retention pond." Nevertheless, plaintiff presented no testimony or evidence at trial establishing that any debris caused or contributed to cause Gul's death. Moreover, in closing argument, plaintiff conceded that debris had no causal role in Gul's death:

> "The point of the debris, the point of all these things in the water,
>
> it's not to say that she got caught on those other things. The point
>
> is it puts them on notice that there's things in the water all the
>
> time."

Accordingly, plaintiff's argument does not present a reasonable hypothesis upon which the jury could find proximate cause.

Lastly, plaintiff argues that the special interrogatory addressed whether the rusted bicycle proximately caused Gul's "death" whereas the issues instruction addresses whether defendants proximately caused Gul's "injuries." As a result, plaintiff maintains that the jury could have found that the bicycle was not the proximate cause of her death for purposes of the wrongful death action, but that it was the proximate cause of her injuries for purposes of the survival action. However, the only evidence related to injuries was the testimony of Officer Santoro, the evidence technician who took photographs of the deceased body at the hospital. He indicated that Gul had two dime-sized cuts that appeared to be recent, one on each of her shins. There was no admissible evidence that those injuries were sustained as a result of defendants' allegedly negligent conduct. Accordingly, plaintiff's argument lacks merit.

We next consider plaintiff's argument that the special interrogatory was ambiguous, confusing, and not in proper form. A special interrogatory is in proper form if "(1) it relates to an ultimate issue of fact upon which the rights of the parties depend, and (2) an answer responsive thereto is inconsistent with some general verdict that might be returned." Simmons, 198 Ill. 2d at 563, 763 N.E.2d at 734. In addition, it should ask "a single question, stated in terms that are simple, unambiguous, and understandable; it should not be repetitive, confusing, or misleading." Simmons, 198 Ill. 2d at 563, 763 N.E.2d at 735.

Initially, we note that plaintiff has forfeited review of this issue. Pursuant to section 2-1108 of the Code, special interrogatories are to be objected to and ruled upon as in the case of instructions. 735 ILCS 5/2-1108 (West 2006); see also LaPook v. City of Chicago, 211 Ill. App. 3d 856, 864, 570 N.E.2d 708, 712 (1991). During the instruction conference, defendants tendered a special interrogatory. Plaintiff then proposed an alternative interrogatory asking whether "the bicycle proximately caused her death." The court amended the interrogatory as follows: "Did the rusted bicycle proximately cause Gul Ahmed's death?" The following colloquy then ensued:

"THE COURT: --they're suggesting the language and you're not objecting to the language because you helped suggest the language even though you objected to the need of a special interrogatory. Is that correct? Would that be correctly stated?

MR. HARRIS [Plaintiff's counsel]: Yes."

Accordingly, because plaintiff consented to the form of the special interrogatory, he cannot now

complain about it. The doctrine of invited error prohibits a party from complaining of an error on appeal "which that party induced the court to make or to which that party consented." In re Detention of Swope, 213 Ill. 2d 210, 217, 821 N.E.2d 283, 287 (2004). See also Eaves v. Hyster Co., 244 Ill. App. 3d 260, 266, 614 N.E.2d 214, 219 (1993) (plaintiff forfeited review where he failed to request that the special interrogatory include reference to his theory of the case during the instruction conference); LaPook, 211 Ill. App. 3d at 864, 570 N.E.2d at 712 ("a failure to specifically object to a special interrogatory when proffered at the instructions conference will ordinarily waive any claim of error in the giving of that special interrogatory"); Chavez v. Watts, 161 Ill. App. 3d 664, 674, 515 N.E.2d 146, 153 (1987) (plaintiff forfeited review for failing to preserve his objection to the special interrogatory).

Nevertheless, we find the special interrogatory to be in proper form. It is a single, straightforward question that relates to an ultimate issue of fact upon which the rights of the parties depend, namely, whether the rusted bicycle caused or contributed to cause Gul's death. It fulfilled its intended function of serving as a check on the jury's general verdict. Our supreme court upheld a similar interrogatory in Simmons, where the court similarly found no error in the giving of an interrogatory asking whether dehydration contributed to cause the plaintiff's death where that was the only cause of death that, based on the evidence presented at trial, could be proximately connected to the defendant's alleged negligence. Simmons, 198 Ill. 2d at 564-65, 763 N.E.2d at 735.

We reject plaintiff's assertion that the special interrogatory "must include all of the elements of negligence, proximate cause, and injuries resulting therefrom." Our supreme court

has specifically held that "[i]t need not contain all of the elements of negligence and is proper if it focuses on one element that is dispositive of the claim." Simmons, 198 Ill. 2d at 563, 763 N.E.2d at 735; see also Snyder, 281 Ill. App. 3d at 62, 666 N.E.2d at 822 (a special interrogatory that contained all the elements necessary to a finding of guilt would be more likely to confuse the jury and less likely to clarify and sharpen the jury's consideration of the questions presented by the case).

Nor do we find any merit to plaintiff's contention that the special interrogatory was confusing because it did not define the terms "rusted bicycle" and "proximately caused" and did not use the same exact terms as found in the jury instructions. Plaintiff is correct that a special interrogatory is to be read in context with the court's other instructions to determine how it was understood and whether the jury was confused. Simmons, 198 Ill. 2d at 563, 763 N.E.2d at 735. However, commonly used terms need not be defined or explained in instructing the jury. LaPook, 211 Ill. App. 3d at 865-66, 570 N.E.2d at 713. The term "rusted bicycle" is a commonly used term and was adequately explained both through testimony and photographic evidence admitted at trial. Furthermore, the jury instruction indeed defined "proximate cause." Merely adding "ly" did not cause confusion. Moreover, to the extent that plaintiff tendered a special interrogatory with the terms of which he now complains, he has forfeited review of this issue. LaPook, 211 Ill. App. 3d at 864, 570 N.E.2d at 712.

Plaintiff also directs our attention to the juror affidavit in which the jury foreperson indicated generally that the jury was confused about the special interrogatory as to its substance and meaning. Our supreme court has made it clear that "[j]uror testimony or affidavits will not

be admitted to show the motive, method, or process by which the jury reached its verdict." Redmond v. Socha, 216 Ill. 2d 622, 636, 837 N.E.2d 883, 891-92 (2005). The rule serves to protect the finality of judgments and the privacy of the jury room. Redmond, 216 Ill. 2d at 636, 837 N.E.2d at 892. Since the affidavit impermissibly seeks to impeach the jury's verdict, we will not consider it. Accordingly, where we find the special interrogatory to be absolutely irreconcilable with the general verdict, and where plaintiff does not dispute the trial court's finding that the answer to the special interrogatory was not against the manifest weight of the evidence, the trial court's entry of judgment on the special finding was proper. 735 ILCS 5/2-1108 (West 2006).

In light of our ruling, we need not address plaintiff's contentions regarding the inadequacy of the damage award. However, to the extent that the other issues he raises may have impacted upon the jury's answer to the special interrogatory, we address them here.

Plaintiff argues that the trial court abused its discretion in refusing to allow Officer Santoro to testify that the cuts on Gul's legs were caused by the rusted bicycle. Prior to trial, defendants moved *in limine* to bar Santoro from testifying on causation. They argued that he did not witness the accident and lacked qualifications in anatomy or forensics to determine when or how she was cut. Plaintiff objected to the motion *in limine*, arguing that Santoro's testimony was akin to accident reconstruction testimony and that Santoro had sufficient experience and training to render those opinions. The trial court granted the motion *in limine*, finding that Santoro's experience as a Schaumburg police officer did not qualify him to give testimony of a forensic nature as to the specific timing of the cuts or the cause of the injuries.

Officer Santoro testified that he was hired in 1995 as a patrol officer. As a patrol officer, he was responsible for investigating accidents, including those involving traffic accident cuts. He became a field training officer and an evidence technician a year prior to this incident. His responsibilities as an evidence technician included responding to a scene, taking photographs, preserving evidence, collecting and inventorying evidence, and documenting it in a report. In an offer of proof, Santoro testified that Gul received her cuts from the rusted bicycle. He based his opinion on "how [the accident] happened, and the area where the bicycle was removed from was where she was reportedly --or she reportedly went into the water." He also based his opinion on what other officers told him after speaking with witnesses who had indicated Gul was struggling to keep her head above the water. He also indicated that he had taken a photography class and some evidence technician classes that aided him in forming his opinion.

A trial court's ruling on a motion *in limine* addressing the admission of evidence will not be disturbed on review absent a clear abuse of discretion. Swick v. Liautaud, 169 Ill. 2d 504, 520-21, 662 N.E.2d 1238, 1246 (1996). Expert reconstruction testimony is proper if what the expert offers is " 'knowledge and application of principles of science beyond the ken of the average juror.' " Watkins v. Schmitt, 172 Ill. 2d 193, 205, 665 N.E.2d 1379, 1385 (1996), quoting Zavala v. Powermatic, Inc., 167 Ill. 2d 542, 546, 658 N.E.2d 371, 373 (1995). The party offering the expert bears the burden of establishing the expert's scientific, technical, or other specialized knowledge. M. Graham, Cleary & Graham's Handbook of Illinois Evidence §702.2, at 454 (4th ed. 1984). "That the defendant had an opportunity to cross-examine [the expert] as to his qualifications therefore [does] not eliminate or in any way reduce the [plaintiff's initial]

burden of establishing those qualifications." People v. Park, 72 Ill. 2d 203, 209, 380 N.E.2d 795, 798 (1978).

Here, Officer's Santoro's opinion that the cuts were caused from the rusted bicycle were not based upon any specialized knowledge or application of scientific principles. Santoro acknowledged that he had no specialized forensic or medical training to determine the timing in which a particular cut came into existence. He had no specific accident reconstruction expertise. Nor did he offer any testimony regarding the nature of the wounds in relation to the bicycle pulled from the water. Rather, the basis for his opinion was that the bicycle was reportedly in the same area as where Gul was recovered and witnesses saw her struggling to keep her head above water. Accordingly, we cannot say that the trial court abused its discretion in granting the motion *in limine* and excluding the opinion testimony as accident reconstruction testimony.

We next consider plaintiff's contention that the trial court erred in directing a verdict in favor of defendants on their alleged negligence regarding (1) the condition of the sidewalk; (2) failure to erect a fence around the pond; (3) failure to warn of the dangerous propensity of the pond and the debris; and (4) failure to provide water floatation devices. As to the sidewalk, because we have already held that the dirt on the sidewalk was not a hazardous condition for which defendants owed plaintiff a duty, the trial court did not err in directing a verdict on that issue. We address the other claims as follows.

In directing a verdict, " 'the trial court determines *as a matter of law* that there are no evidentiary facts out of which the jury may construe the necessary fact essential to recovery. (Emphasis added.).' " Sullivan v. Edward Hospital, 209 Ill. 2d 100, 112, 806 N.E.2d 645, 653

(2004), quoting Jones v. O'Young, 154 Ill. 2d 39, 47, 607 N.E.2d 224, 227 (1992). Accordingly, our review is *de novo.* Sullivan, 209 Ill. 2d at 112, 806 N.E.2d at 653.

In their motion for a directed verdict, defendants argued, contrary to plaintiff's contention, that they owed no duty of care with respect to the pond and, therefore, were entitled to a directed verdict in their favor on all issues. Whether a duty exists is a question of law to be resolved by the court. Forsythe, 224 Ill. 2d at 280, 864 N.E.2d at 232. With respect to bodies of water, although not a *per se* bar to recovery, under Illinois law, owners or occupiers of land generally do not owe a duty to protect children from falling into bodies of water and drowning or potentially drowning. The danger of drowning in a body of water is generally considered an open and obvious risk which both minors and adults should be expected to appreciate and avoid. Cope v. Doe, 102 Ill. 2d 278, 286-87, 464 N.E.2d 1023, 1027 (1984); see also Bucheleres v. Chicago Park District,171 Ill. 2d 435, 457, 665 N.E.2d 826, 836 (1996) ("[T]he law does not require persons to protect or warn against possible injuries from open and obvious conditions, which by their nature carry their own 'warning' of potential harm"); Corcoran v. Village of Libertyville, 73 Ill. 2d 316, 326, 383 N.E.2d 177 (1978) ("Even if an owner or occupier knows that children frequent his premises, he is not required to protect against the ever-present possibility that children will injure themselves on obvious or common conditions"); Mostafa v. City of Hickory Hills, 287 Ill. App. 3d 160, 165, 677 N.E.2d 1312, 1316-17 (1997); see also Restatement (Second) of Torts §339, Comment *j,* at 203 (1965). "[S]ince children are expected to avoid dangers which are obvious, there is no reasonably foreseeable risk of harm." Cope, 102 Ill. 2d at 286, 464 N.E.2d at 1027.

Here, it is evident that the danger presented by drowning in the retention pond was open and obvious and that Mrs. Ahmed and Gul could appreciate the danger as Gul rode around the pond, given their inability to swim. The pond was not intended for swimming. The primary function of a retention pond is to collect and retain surface water to prevent flooding. Cope, 102 Ill. 2d at 288, 464 N.E.2d at 1028. Indeed, defendants posted a warning sign, indicating no swimming, fishing or skating.

Furthermore, plaintiff presented no evidence other than mere speculation to support that the failure to provide these items proximately caused Gul's death. The evidence was that defendants erected a sign warning that there was no swimming, fishing or skating allowed. To the extent that plaintiff argues that defendants should have warned of debris in the pond, there was no evidence that had they warned of debris, it would have prevented Gul from falling in and drowning. Similarly, with respect to the life preserver, there was no evidence presented at trial that defendants' failure to provide such a device proximately caused her death. Lastly, with respect to the fence, as the trial court indicated the evidence of causation was lacking, "there's nothing to say that a fence actually couldn't be almost as dangerous if not as dangerous as the water itself. Depending on what you put up, we *** could be here with her getting impaled on such a fence falling down the hill." Speculation is not proof and will not support causation. Thacker v. U N R Industries, Inc., 151 Ill. 2d 343, 354, 603 N.E.2d 449, 454 (1992). Accordingly, for the foregoing reasons, the trial court did not err in granting directed verdicts on these claims.

We next consider plaintiff's argument that the trial court abused its discretion in refusing

to give a missing-evidence instruction with respect to an audiotape of the Pickwick board meeting on the evening of the accident. An IPI Civil (2006) No. 5.01 instruction "allows the jury to infer that any evidence not offered but within the control of a party is adverse to that party." First National Bank of LaGrange v. Lowrey, 375 Ill. App. 3d 181, 210, 872 N.E.2d 447, 475 (2007). An IPI Civil (2006) No. 5.01 instruction is warranted only if " 'there was no reasonable excuse for failure to produce the evidence.' " Simmons, 198 Ill. 2d at 573, 763 N.E.2d at 740-41, quoting Brown v. Moawad, 211 Ill. App. 3d 516, 531, 570 N.E.2d 490, 500 (1991). The decision whether to give the missing-evidence instruction is within the sound discretion of the trial court and will not be reversed absent a clear abuse of discretion. Simmons, 198 Ill. 2d at 573, 763 N.E.2d at 740-41.

The evidence presented at trial was that on the day of the accident, the Pickwick Place Owners' Association board had a regularly scheduled monthly meeting. Board members testified that at the time of the meeting, they were aware that there had been an accident, and that the accident may have been mentioned at the meeting, but that it was not made a topic for discussion during the meeting. A discussion of the accident is not reflected in the board's meeting minutes, which were admitted at trial. Board members indicated that it was the board's custom and practice to audio tape the meetings, transcribe them and then tape over or discard them. The audiotape had been taped over after the minutes of the meeting had been transcribed. Thus, defendants argued that they did not have the power to produce the tape at trial. The trial court found this to be a reasonable explanation for its absence. Accordingly, we cannot say that the trial court abused its discretion in refusing to give the missing-evidence instruction.

Lastly, we reject plaintiff's conclusory assertion that the trial court did not have a full and fair opportunity to review various issues presented to the trial court throughout the trial. Plaintiff's assertion is wholly unsupported by the voluminous record before this court. Indeed, the record reveals that the trial court gave ample consideration to all issues raised and allowed plaintiff numerous opportunities to argue his position to the court.

For all of the foregoing reasons, we affirm the judgment of the circuit court.

Affirmed.

MURPHY, P.J., and QUINN, J., concur.

REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT
_____

WASIM SAM AHMED, as Administrator of the Estate of
Gul Nageen Ahmed,

     Plaintiff-Appellant,

     v.

PICKWICK PLACE OWNERS' ASSOCIATION
and VISTA PROPERTY MANAGEMENT, INC.,

     Defendants-Appellees.
_____

No. 1-07-2047

Appellate Court of Illinois
First District, Third Division

Filed: September 30, 2008
_____

JUSTICE THEIS delivered the opinion of the court.

Murphy, P.J., and Quinn, J., concur.
_____

Appeal from the Circuit Court of Cook County
Honorable Sharon Johnson Coleman, Judge Presiding
_____

For PLAINTIFF-          Gregory A. Harris
APPELLANT,          Law Offices of Gregory A. Harris
                    1701 South First Avenue, Suite 207
                    Maywood, IL 60153

For DEFENDANTS-      Edward M. Kay
APPELLEES,          Paul V. Esposito
                    Kimbley A. Kearney
                    Kimberly A. Hartman
                    Joseph J. Ferrini
                    Clausen Miller P.C.
                    10 S. LaSalle Street
                    Chicago, IL 60603